**IN THE COURT OF APPEALS OF IOWA**

No. 16-0596
Filed June 7, 2017


JACK A. MIXDORF AND SHELIA K MIXDORF, GERALDINE R. JENNER, TRUSTEE OF THE GERALDINE R. JENNER REVOCABLE TRUST U/A DATED OCTOBER 15, 2003, ROLAND R. NEIL AND CHERYL A. NEIL, THOMAS LEE, KATHLEEN A. BOYD, AND PAUL NIEMANN CONSTRUCTION COMPANY,
    Plaintiff-Appellees,

**vs.**

**JON A. MIXDORF,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Bremer County, James M. Drew, Judge.


Jon Mixdorf appeals from the district court order resolving a boundary dispute with his neighbors. **AFFIRMED.**


Samuel C. Anderson of Swisher & Cohrt, P.L.C., Waterloo, for appellant.

Thomas C. Verhulst of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellees Jack Mixdorf, Sheila Mixdorf, and Geraldine Jenner.

Patrick B. Dillon of Dillon Law, P.C., Sumner, for appellee Paul Neimann Construction Company.


Heard by Vogel, P.J. and Doyle and McDonald, JJ.

**DOYLE, Judge.**

Jon Mixdorf appeals from the district court order resolving a boundary dispute with his neighbors.[1] He contends the district court erred in sustaining the actions to quiet title to two owners of western neighboring property and in determining the location of the northern boundary of his property. For the reasons that follow, we affirm the district court's order.

**I. Background Facts and Proceedings.**

The boundary dispute at issue involves Black Hawk County real estate once owned by Albert and Ruby Mixdorf. Before their deaths, Albert and Ruby deeded parcels of that real estate to their children as gifts.[2] They gifted Jack Mixdorf the land immediately north of the land they gifted to Geraldine (Jeri) Jenner. Jon was gifted the land to the immediate east of the land gifted to Jack and Jeri.

Paul Niemann Construction Company (PNC) owns a quarry immediately north of Jon's property. In 2012, PNC removed an old fence that separated the properties in order to rebuild a berm. The following summer, without first obtaining a survey, Jon modified the farm lane that runs across the north end of his property and installed a deer fence and boundary fence along the boundaries of his property.

---

[1] Other property owners and issues were involved in the district court's order, but for the sake of simplicity, we only reference the property owners and issues relevant to this appeal.
[2] Albert and Ruby also deeded the land at issue to their children's respective spouses. Again, for the sake of simplicity, we only refer to the three children of Albert and Ruby involved in this appeal.

In 2014, Jack, Jeri, and PNC were among the plaintiffs to file a petition to quiet title, alleging Jon had interfered with and encroached upon their property. Following a trial, the district court found Jon failed to prove his claims of adverse possession and boundary by acquiescence. It entered an order granting the petition to quiet title filed by Jack and Jeri and ordered Jon to remove the existing deer fence from their properties. The court denied PNC's petition to quiet title because it found Jon had established a boundary by acquiescence, but it ordered Jon to remove the farm lane to the extent it encroaches on PNC's property.

## II. Scope and Standard of Review.

The standard of review for equitable proceedings, such as actions to quiet title by adverse possession, is de novo. *See Albert v. Conger*, 886 N.W.2d 877, 879 (Iowa 2016). By statute, our standard of review of an acquiescence claim is correction of errors at law. *See id.* However, because the parties appear to be in agreement that the claims were equitable and tried in equity, we will apply a de novo review. *See id.* We examine both the facts and the law and decide the issues anew but give weight to the trial court's factual findings, even though they are not binding on us. *See Brede v. Koop*, 706 N.W.2d 824, 826 (Iowa 2005).

## III. Analysis.

Jon argues the trial court erred in quieting title to Jack and Jeri and in holding him responsible for moving the farm lane and fence on the northern boundary of his property. He raises claims under the theories of adverse possession, boundary by acquiescence, and equitable estoppel. Jon bears the burden of proving his claims by clear evidence. *See Egli v. Troy*, 602 N.W.2d 329, 333 (Iowa 1999) ("A party seeking to establish a boundary other than a

survey line must prove it by 'clear' evidence." (citation omitted)); *Mahrenholz v. Alff*, 112 N.W.2d 847, 849 (Iowa 1962) ("To establish by acquiescence or estoppel a boundary which varies from the true line the proof must be clear."); *Louisa Cty. Conservation Bd. v. Malone*, 778 N.W.2d 204, 207 (Iowa Ct. App. 2009) (noting the burden on party claiming adverse possession is "clear and positive proof").

### A. Western-boundary dispute.

Jon first contends the trial court erred in sustaining the actions to quiet title to Jack and Jeri, arguing he proved the existence of the western boundary of his property under the theory of adverse possession or by acquiescence. To succeed on his adverse-possession claim, Jon was required to show "hostile, actual, open, exclusive and continuous possession, under claim of right or color of title for at least ten years." *C.H. Moore Tr. Estate v. City of Storm Lake*, 423 N.W.2d 13, 15 (Iowa 1988). To succeed on his boundary-by-acquiescence claim, Jon was required to show the parties treated the claimed line as the boundary for a period of ten years or more. *See Albert*, 886 N.W.2d at 880. For a boundary by acquiescence, "[t]he adjoining landowners or their predecessors must have knowledge of and consent to the asserted property line as a boundary." *Egli*, 602 N.W.2d at 333.

The district court found Jon failed to establish either adverse possession or boundary by acquiescence:

> With respect to [Jon]'s western boundary, the evidence establishes that the field has historically been tilled from north to south roughly along the legally described boundary. For years, an established tree line separated the parcel Jon now owns from those owned by Jack and Jeri. Furthermore, a fence of convenience

existed along the same general line, most likely immediately on the east side of the trees as asserted by [Jack]. There is no "clear and positive" evidence that [Jon] occupied the ground west of the legally described boundary such that he is entitled to ownership by virtue of adverse possession.

. . . .

The evidence establishes that a fence line historically separated [Jon]'s land from the property belonging to Jack and Jeri. The fence was in a long-standing tree line that runs virtually on top of the legally established boundary. There are no other monuments in the area to indicate an intention on anyone's part to vary from the legal survey line. Therefore, there is insufficient evidence to establish a boundary by acquiescence on this portion of [Jon]'s property.

The evidence overwhelmingly supports the district court's findings. A fence marked the boundary between Jack's and Jeri's properties and Jon's property prior to the 2013 installation of the deer fence. The old fence ran north to south in approximately the same manner as set forth in the legal description, as was shown by the survey. The evidence shows the old fence ran to the east of a tree line; Jon installed the new fence on the west side of the tree line. Jon has failed to show he adversely possessed the land west of the boundary at any time prior to 2013. Accordingly, his claims fail.

Additionally, with respect to his boundary-by-acquiescence claim, Jon cannot show Jack or Jeri had knowledge of or consented to the boundary claimed by Jon for any period of time, let alone for ten years. The evidence shows Jon asked for Jack's permission to clear out the old fence and that he informed both Jack and Jeri that he would be erecting a deer fence between their properties, but he never informed either as to where the new fence would be located. When Jack noticed the location of the temporary fence, he immediately

asked Jon to remove it, but Jon told him it was only a temporary fence and he would erect the permanent fence where the old fence had been located.

Because Jon's claims of adverse possession and boundary by estoppel fail, we affirm the portion of the district court order quieting title to Jack and Jeri.

**B. Northern-boundary dispute.**

With regard to the northern boundary of Jon's property, the trial court denied PNC's petition to quiet title. The court found Jon had established a boundary by acquiescence that runs parallel to the established boundary line in relation to the location of an old fence post. However, the court ordered that to the extent that Jon's farm lane encroaches beyond that line, it would need to be removed and decreed Jon "shall be responsible for removing it."

Jon appeals this portion of court's ruling, arguing the boundary should be determined under the theory of estoppel based on an agreement he alleges he made with PNC. The theory of estoppel holds that

> where one has invaded the right of another, thinking he is within his own right, and that invasion is known to the other, and the other stands by and sees him make valuable improvements upon the invaded territory, under the supposition that it is a part of the possessions of the invader, equity will thereafter deny to the invaded the right to object to the invasion.

*Mahrenholz*, 112 N.W.2d at 851 (citation omitted). Estoppel is similar to adverse possession, though estoppel may apply before the ten years required under the adverse-possession theory. *See id.*

Jon's estoppel claim centers on the meeting he had with PNC's superintendent, Lee Pries, at his farm on July 10, 2013. Jon claims that at that meeting, he and Pries agreed to the location of the boundary line, which was

marked with flags. Jon testified that he determined where to locate the farm lane and the deer fence based on the conversation he had with Pries at that meeting. However, Pries testified that he was not comfortable with using the flags as the location of the boundary "because I had no idea where the west end was." He claims he informed Jon at that meeting that he was not satisfied with using the flags as the boundary. Pries then discussed the matter with PNC's general manager, Ron Abbas, and Abbas told Pries they should have the land surveyed. Pries testified that after speaking with Abbas, he called Jon and "told him that we were going to have a survey done because we weren't sure on the west end." In his testimony, Abbas recalled that he met with Pries in July 2013 to discuss the border issue and Pries had stated he "was not comfortable with what had transpired out there, where [Jon] had put the flags to establish the property line, and I basically told him that we should get it surveyed," which PNC did.

In its ruling, the district court stated it was "not convinced" by Jon's testimony regarding his alleged agreement with Pries as to the location of the boundary. Where, as here, the parties' present conflicting testimony, we accord the trial court's fact findings "great weight" because "the trial court is in a far better position to weigh the credibility of witnesses than the appellate court." *Albert*, 886 N.W.2d at 880 (citation omitted).

> Unlike this court, the trial court has a front row seat to observe the "witness's facial expressions, vocal intonation, eye movement, gestures, posture, body language, and courtroom conduct, both on and off the stand," as well as the witness's "nonverbal leakage" demonstrating "[h]idden attitudes, feelings, and opinions" that are not reflected in the cold transcript this court reviews. Consequently, the trial judge is in the best position to assess witnesses' interest in the trial, their motive, candor, bias, and prejudice.

*Id.* (alteration in original) (internal citation omitted). Deferring to the trial court's finding, there lacks clear and convincing evidence that Jon and Pries entered an agreement as to the location of the boundary line.

In the alternative, Jon argues it would be equitable to require PNC to pay the expense of moving the lane and the deer fence. The record does not establish an agreement was reached between Jon and PNC regarding the location of the boundary. Regardless, Jon moved his farm lane and installed the deer fence a short time later without first obtaining a survey. On this record, the court's resolution of the issues was equitable. Accordingly, we affirm.

**AFFIRMED.**